would both attorneys that are going to argue today please step up to the podium and identify yourself for the record. Good morning, my name is Thomas Branstrader, B-R-A-N-D-S-T-R-A-D-E-R for Mr. Corral. Good morning, Mr. Branstrader. Good morning, Your Honors. Assistant State's Attorney Alan Spellberg representing the people of the state of Illinois. Each of you will have about 15 minutes to present an argument, and from that, Mr. Branstrader, you may save out some time for rebuttal. Thank you, Your Honor. All right. May it please the Court. Counsel. In September of 2014, Pedro Corral was a 16-year-old boy. That fall, he found himself accused, arrested, charged, and subsequently convicted of first-degree murder. We believe the sole issue in this case is the identification of Mr. Corral as the offender. If I could interrupt you along those lines, I have a question regarding Dr. McClure's testimony. Yes, sir. All right. So the Court limited the testimony. How did the Court abuse his discretion? Dr. McClure got to testify that all the factors regarding unreliability, got to opine as to the factors being in this case and also what impact that would have on an eyewitness' identification. So where's the prejudice here with regards to the Court's ruling? As we argued, Judge, pursuant to Supreme Court Rule 704, an expert who gives testimony can reach the ultimate issue. We think it's effective. Obviously, it's a very difficult area for the layperson to pick up on and to listen to, and we think that the allowance of an expert to give his or her opinion should be heard by the trier of fact. The Court is correct. She went through all the factors. She listed them all as the opportunity to observe, focus on the gun, focus on the weapon, passage of time between identifications. Has Rule 704 ever been interpreted, though, vis-à-vis an identification expert? It has not, Judge. But we know, the people versus Lerner, that the Courts now are realizing that for all these years, this is an issue that maybe has not been handled properly over the years, based on the fact that, as I think stated in briefs on both sides, 325 exonerations included 70% with misidentifications. Well, I think that Lerma points out that the single most significant factor that has resulted in exonerations is misidentification. Don't they also point that out? Yes, sir. All right. But does Lerma go as far as you're asking us to go in that an eyewitness identification expert should then be First, Judge, Lerma did not address that issue. That's right. Lerma fired all the evidence. Yes, the trial judge did. Secondly, and this is where I think I thought there was some confusion, Dr. McClure was not going to comment on Mr. Vargas as being credible or not credible. Well, what would she have said? She would have said that based on my observations and my review of this record and the factors that we have outlined in not only memo but in my testimony, that those factors are all present here. And it would result in an unreliable identification. I'm not saying Mr. Vargas isn't. Didn't she go through all the factors and, in a way, suggest that these are the types of things that can lead to an unreliable identification? For example, the fact that a gun is present. But she went through all of these, and then she cataloged all the things that were present in this case. But my question to you is, does Lerma really envision, or even Rule 704, that in an identification case where one witness is going to thereafter testify to the credibility of another witness, that's generally not allowed? I understand that, Judge, and, again, I say that that's not what was going to happen. She wasn't going to call Mr. Vargas a liar. She was going to say, well, you've got to consider what Mr. Vargas was going through when he made this alleged identification. He was looking at a gun. He was frozen in fear. Didn't she say all of them? Didn't she go into that? She did. Yeah. But Rule 704 allows us then to take it one step further and say, based on these factors that we see in this case, the result is an unreliable identification. Not a lying identification. An unreliable one. Now I'll go back to what I think. You're asking us to interpret 704 in a way that you agree has not ever been interpreted. It has not. And there are a number of cases that have always drawn the line about one witness testifying. And I know your position is she wasn't going to opine about the credibility. But, really, at the end of the day, she was going to opine about the credibility of the witness, wasn't she? Well, the jury is sitting in the box. They hear all of these factors. Yes. And at the end, from this expert, they hear, it's my testimony that, based on my experience and my research and my review of this record, all the factors are present that lead to an unreliable identification. No comment about Mr. Vargas and the fact that he was a liar. She doesn't have to say that. But could we pull out of her testimony just what you're saying? Well, lawyers could. Judges could. That aren't necessarily jurors. When they hear all this, I think it's to the benefit of everybody in the courtroom that they hear what all of this means. And it all means an unreliable identification. Now, let me address one thing, and the court has brought it up twice. This has never been done before. But also, if we read Lerner, the whole issue of identification and how we deal with them is all evolving. Yes. I speak from personal experience that I raised this in 2004 in a murder case in 2016. Didn't go anywhere with it. The judge wouldn't hear it. And as years have developed, now we're to the point with the guidance of the Supreme Court, Yeah. Particularly when it's the only evidence of guilt. And I agree with you completely. But I think that you're asking us to go a little further than what is envisioned. And let's talk about 704 again. Traditionally, an expert can opine about the ultimate issue. But we see that in medical cases, in legal malpractice, in medical negligence, where one doctor gives an opinion that another doctor did not follow the standard of care. But I'm not sure that 704 envisions saying that a witness is unreliable. I mean, that's the issue here, isn't it? That the expert should be allowed to say that given all these factors, this witness made an unreliable identification. Not lying, but mistaken, I guess. Well, it's not the witness who's unreliable. It is the factors present in the identification procedure that makes the identification suspect and unreliable. Don't we have that here? No, because she went through all the factors. She indicated very clearly, you know, what factors were present and their impact of an eyewitness, right, if those factors are here. She went through the trust factors. She also went through the, what's it called, the optimal circumstances, right, and inattentive blindness, right? And she basically gave her opinion. And if these factors are present, then this testimony that could be presented is unreliable. I think, as I recall the record, that got an objection to it. Well, it got a rejection, but you still got to testify. Well, it is. And I can only say that what we're asking is that based on the development of the factors about identification and how they impact in a criminal case, yes, are we in uncharted waters? We are. But a few years ago, we couldn't even get her testimony into the record. And that's how we're evolving. The fact, and again, maybe I'm not stating it correctly, she's not saying he's not credible. She's saying this, that, and this all appear in this record. And it's my position that it's at least an unreliable identification for all of those factors, not because he's a liar, that he is, that he's at least an unreliable identification. I don't believe she ever got that into the record because it got objected to. If it got in the record, then is this sort of a moot point? If reviewing the record here, if it appears that essentially her testimony was exactly what you're saying, then is this a live issue? But you believe it was objected to and there was never, ever this ultimate issue. It never got to the ultimate issue. All right, one other thing about this whole thing. Is this really a single witness identification case? I believe it is. All right, what about the fact that there was testimony regarding the co-offender, there was substantial testimony of who he was, he was identified, wasn't he? It was, yes. Yeah, okay. So, but I mean, in the record, this isn't really just a single identification. The witness here, the eyewitness. Vargas. Yeah, Mr. Vargas, he identified this other individual, didn't he? Yes. And there was other testimony about how they came about directing their focus on this defendant, police officers. So, and then he, the defendant, didn't he indicate on cross that he knew the other offender? Let me start with the first half of the question. There is no nexus shown between Guidas and Mr. Correll. Importantly, on all the phone records, you don't find Correll's phone, if you had one, anywhere, between Vargas, Alfaro, or Guidas. But wasn't the SIM card missing from this defendant's card, so he couldn't, there was no way for the police to ever. But they would have seen it on the other guy's phones. Well, yes. They would have seen his number. Yeah. Who's this? Okay. Also, the state's argument in their brief was the fact that because Guidas' fingerprint was found on the jar. That's right. I forgot about that, yeah. But you're saying there was absolutely no connection. No nexus. There's no physical evidence. There's no confession. There's no DNA. Who was the person that he indicated he knew? Maybe I. Anthony. Who was the Tony? Anthony. He's Guidas. Yeah. So didn't he admit to the detective that he knew him? But then I'm assuming. No, no, no. I'm sorry. I understand now what you're saying. I think that's really an issue because when we played with the detective in rebuttal, and sir rebuttal by the defense, what I hear is, did you know Guidas? Well, Mr. Correll said, I played baseball with a Guidas. Right. Then Murphy says something like, well, then you know him. And he goes, yeah. And then the detective says, Tony Guidas. Not Mr. Correll. Mr. Correll knew his brother. Doesn't Mr. Correll refer to him as Anthony? I think his name is Antonio. Yeah, but doesn't Correll refer to him as, when he says Tony, he says, that's what you mean, Anthony. Well, that wouldn't be so surprising if he knows his brother, played baseball with his brother, that he'd know the name. How does that make him accountable for a murder, that he happens to know the guy? I'd ask the court to find, there's no nexus between Guidas and Mr. Correll. I think there's just perhaps at least some circumstantial evidence in this record, rather than saying it's simply a single eyewitness case. But I understand your point. Can we go back to Lerner for a moment? All right. So the court tells us that our standard review with regards to this type of testimony is abuse of discretion. All right. And the court basically says that you have to look at whether or not there was a failure to scrutinize this testimony. Are you indicating here that the trial court abused its discretion with regards to the testimony that was presented by limiting Dr. McClure? Judge Ghan, at least, let the doctor testify, but did not let the doctor in accordance with 704 say, based on all the factors that I see in this case, this leads to an unreliable identification, no matter who made it. And the court of facts should have heard that. So the answer to my question is that Judge Ghan. I wouldn't call Judge Ghan's ruling in this case an abuse of discretion, other than the fact he should have followed Supreme Court rule that the defense pointed out to him. Well, when the court doesn't follow a rule or case law, there's cases that clearly say that that's an abuse of discretion. Okay. Well. So, I mean, there are. I know you know this. It's in the middle of it. And, again, we are in an evolving situation with this identification testimony. And Judge Ghan, I thought, did as much as he thought he was going to let happen, and she was going to testify to all of these things that led to an unreliable identification. And, again, you know, we're talking about single-finger and things like this, but Mr. Vargas was a liar. Well, either way, it was an identification case. There's no question about that. Mr. Vargas was incredible, but on different scores. He lied to 911. You're not attacking it on that basis. On a motion to suppress identification, is our standard of review the same as it is for a motion to suppress a statement? In other words, is it do we first, do we have a manifest wait for the factual findings and then do no vote on the ultimate issue, or are we talking about something that's slightly different with a motion to suppress identification versus a motion to suppress statements? I think we stood on the bicameral decision. First, you decide whether the facts are heard by the court, and then this court gets to do a genomic review. Okay. One thing that I'd like to comment on that motion to suppress, and the State argued, well, what you're talking about wasn't the law yet. Well, it was only three months later that our ID protocol changed. Yes. And to say that, well, you can't suppress it for that reason because it didn't adhere to the protocol is form over substance. Everybody knew in the courtroom what was happening in Springfield about identifications and what was going to happen, all the talk we've had about it in all the committees, about how identification leads to wrongful convictions. There was nothing wrong in September of 2014, three months before it became law, to do it right, to get it right. So you're saying that we should consider Section 107A2? If the idea is to do this right and get it as close to humanly possible as we can to a reliable identification, I think this court has a right to say, you know, they could have done a lot more on this than they did. And in January 15, we knew what they should have done. We knew in September 14, too. Well, as far as the photo array, there's supposed to be five photos as opposed to four, right? Yes. I'm sorry, the lineup. The lineup, I'm sorry, yes. The photo array, what was wrong with the photo array as far as the statute? Well, in fact, the photo array itself, other than the fact that Corral was in position for the photo array, as he was in the physical lineup, and that's, that would not have passed mustard in January of 2015. Also, Director Murphy shouldn't have been doing that, either the photo lineup or the. Okay. As far as the lineup, though, and does the statute say what happens if you don't follow it? In other words, is there any consequence? Let's say, for example, in this case, you know, this officer who conducted the lineup, he had to actually use a police officer in the station, and he was able to enlist two, well, there were two younger individuals, I guess, in the police station. One was 17, one was 19, and the defendant here was 16, correct? Correct. So they were all within the same age group. The officer was older. It appears that the haircuts were very similar. They all appeared to be male Hispanics. Would that be an accurate representation? It is, Judge. It was close. So how does, I mean, the fact that the, one of the purposes behind photo arrays is to identify a suspect initially so that you can rule out certain people, and then with a lineup, the other, one of the purposes is to ensure that if the suspect can't be identified, that he be released. So what do you do? Are the police supposed to wait for hours to get somebody else into the lineup? I mean, he did ask permission if he could have four as opposed to five. It wasn't like it was, you know, they were being unreasonable. Well, obviously this was a situation where they couldn't get everybody to look alike, and that, I don't think, I mean, obviously it would be a nice goal, but you ask what should happen. First, if we go by the statute and the lineup protocol doesn't meet it, well then the court should, the state should be prevented from introducing that testimony and must show an independent origin. Does the statute say that the lineup identification cannot go forward without a separate hearing permitting or establishing that there was an independent basis for the identification? I'm not going to try to quote the statute. I just know that there has to be an independent basis, and that of course brings us to the situation he picks out the wrong guy in the courtroom. Can you explain what happened there in terms of? They'd ask him to look up, stand up. The judge told him to stand up, go out to the middle of the courtroom, pick out the young guy. He pointed to a guy sitting in the first. Wasn't there like something in his way or something? Because then he asked him to get out of the location. The state said if there's something blocking your view, because in the courtroom the defendant sits way to the left, and from the witness stand you'd have to go like that. So the state and Judge Braun said stand up and stand out in the middle of the courtroom, and he pointed to a guy in the gallery. But then he actually identified the guy. And wasn't there actually something in his way? Were you the trial lawyer? No. No. Wasn't there actually something in his way? There was nothing in his way. There's no if they don't, the lectern is in the back. Wouldn't there be an independent basis in this case because he was with this person for about 30 minutes? I have to disagree with you. He wasn't looking at him for 30 minutes. No, he said he was in the car with him. He was looking back and forth in the rear view mirror. From the time they started to the time that the actual shooting occurred, it was about a half an hour, wasn't it? I have to disagree with that. They met at the 7-Eleven. He's talking to Husky. He's talking to Husky in the car. The kid is in the back. Not Corral. The kid's in the back. Got a hoodie on. Not talking. Nobody's directing any attention to him. They get to in front of the drug dealer's house. We want to go in. So they drove around the block. And the house is only three blocks from the 7-Eleven. So they weren't caught regarding like that for any length of time. I don't know that anybody did a time capsule on it, but I don't think it was anywhere near 30 minutes. Did he have the hoodie on the entire time that he was with Vargas or just during a period of time? I don't know what he said about the hoodie being up at the 7-Eleven outside the car, but he did have it on when he went to the Green Trail Blazer because it was raining. And he had it on when he got out of the car to go to the back of Galindo's house. Our argument is that the opportunity to observe was not that strong. Any other points you want to add? Nothing, just based on what we've talked about.  We'll give you some time for rebuttal. Good morning again, Your Honors. First off, in regards to counsel's assertion that this is uncharted territory, we would disagree. It is true that LRMA didn't specifically address the question of the scope of the expert identification testimony. But it didn't need to because prior to LRMA in People v. Becker in 2010, the Illinois Supreme Court reiterated a long-standing rule that while an expert can testify to the ultimate issue, an expert cannot comment on the credibility of another witness. And that's precisely what was litigated below. That's precisely what Judge Vaughn ruled below. Well, isn't Mr. Branstrader actually arguing something different? That this is not a comment on credibility. It's a comment on whether or not the circumstances are such that would lead to an unreliable identification. You know, credibility is one thing. Being mistaken, I think, is a little bit different. Isn't it slightly nuanced here? Your Honor, I agree that that's what Mr. Branstrader is trying to argue, but that's not actually what he is arguing. And that's not what happened below. Well, he argued it just a few minutes ago. I mean, I think that's his position. It's not about credibility. He's saying that the expert should be allowed to say whether or not, in his or her opinion, the identification was unreliable based on these factors. And, Your Honor, I believe that's exactly what the expert was allowed to testify to and did. She listed all of the factors which she, in her experience and her expertise, says that identification is not reliable and shouldn't be considered as trustworthy. She went through all those. The only time that she was precluded from testifying, this appears on pages 522 and 523 of the record, the only time is when she expressly said, Mr. Vargas' identification is unreliable. When she directly said that his testimony, after having reviewed the transcript of his testimony earlier that day, earlier in the proceedings, that that was unreliable. And what the record reflects at that moment, Judge Vaughn said, we're going to have a sidebar. He brought the party. He had the jury leave the room, and he made it very clear to the expert what she was allowed to testify to, that she couldn't comment on Vargas' testimony as unreliable as his lack of credibility. Was that ever stricken from the record, though? Because then after the sidebar, does it go back out and then they re-ask the question? Your Honor, it asks questions exactly that you had reiterated to counsel, which was going through all of the factors in your expertise, does this make the identification unreliable? And the key, I think, is actually found in the Becker case. And what Becker says is that an expert cannot be directly asked about the credibility of another witness. And that's what was happening here. That's what Judge Vaughn said. What happened with the second question, then? You said that Justice Reyes just asked, didn't they go back out, and the same question was asked again? My recollection of the record is the same question was not, was Vargas' testimony regarding his identification unreliable, but was, are these factors unreliable? But that wasn't stricken from the record. That was my question. Her testimony that Vargas' testimony was unreliable, that was never stricken from the record, though, was it? You're probably correct, Your Honor. As I think now, I don't remember it being stricken. I just remember that. Well, I thought there was an objection before she answered. My recollection, Your Honor, and I could be wrong about this, was that almost immediately Judge Vaughn essentially staffed the proceedings and ordered the jury to be removed. So you think there was an answer that said yes? It was her non-responsive answer that brought up Mr. Vargas' testimony. Well, we'll have to look at the record. But I believe that Becker is the key to this because it is that longstanding rule, and it's consistent with Rule 704 in that the expert is allowed to testify to the ultimate issue. Is the defendant guilty? Is the doctor liable? All those things. But he's not allowed, she's not allowed to testify about another witness' credibility. Can't say that her testimony should be disbelieved or his testimony should be disbelieved. And that's what Judge Vaughn was ruling, and that's why it was a proper exercise of discretion in this case. Judge Vaughn clearly followed Lormont. What about 704 that says the expert may testify on an ultimate issue? Well, Your Honor, I believe the ultimate issue in any case would be is the defendant guilty, or is an identification under these circumstances reliable, and that is this witness' testimony credible and should be believed. And that's the distinction that the law has always recognized, and that's what Judge Vaughn was trying to ensure occurred in this case, to leave it to the jury to decide how to assess Mr. Vargas' testimony, while also leaving it to the jury to decide how to assess Dr. McClure's testimony about factors that go into reliable identifications. But would your position also be that there was such an extensive amount of testimony from this witness that she basically opined to the fact that this was basically an unreliable identification? Absolutely, Your Honor. She was not restricted in her ability to list all the factors that amounted, in her mind, to an unreliable identification, and then was also to liken it directly to the facts of the case as happened in this case regarding Mr. Vargas' opportunity to view the offenders. What she wasn't allowed to say was that means Mr. Vargas' identification is unreliable. She was allowed the jury to infer that, but she wasn't able to say it directly. And that's all the pecker says, and that's all that Judge Vaughn did here. I have a question regarding the sufficiency of evidence. We don't really have any physical evidence here linking the defendant to the shooting. We have no DNA. We don't have no fingerprints. We only have one eyewitness who really didn't even see the defendant shoot the victim. So what behavior demonstrates that the defendant is guilty beyond a reasonable doubt in terms of evidence? Well, Your Honor, understanding the fact that this is an unusual single-finger case and that there is some corroborating evidence regarding the other defendant, the other offender. But even with that, what we have is Mr. Vargas' clear testimony as to how the defendant, Pedro Corral, was there going to engage in the purchase of the marijuana. He was the one, after the co-defendant, Geddes, says to him, who immediately takes out the gun, pulls back the slide, and points it at the defendant. He testified that he saw him with the gun in his hand, didn't he? Yes, that's exactly what I was saying, Your Honor. But he never sees it. He doesn't see it at all because he runs and he turns, but immediately starts hearing shots. And so while – I'm sorry to interrupt, but there's also a question about – because he says like three or four, but there was actually eight shots that – I think he says five or six is my recollection, maybe three or four. But it's not uncommon for a witness to not remember the exact number of shots. I believe he says that everything happens within a matter of seconds, in that he's trying to run up to the back of the basement and trying to go around. The victim is heading to the door and ends up getting shot in the back. Everything is happening very fast. He may not have heard all the shots or he may not have remembered the number of shots. But absolutely, he does testify categorically that he sees the defendant take out the gun, slide and pull the slide back, and lift it up and get ready to point it when he turns. Well, there was only one gun. There was only one gun, Your Honor. There was significant testimony regarding the bullets and the shells. I thought there was testimony in that regard. But there's absolutely no question that they all came from the same gun. No, Your Honor. No one ever suggested that this other guidance, whatever his name is, pulled out a gun. Even if there were, that would still amount to an accountability for the defendant in this case. Do you agree, as far as the motion to suppress identification, that the standard is exactly the same for our purposes of review? Or is there something slightly different about a motion to suppress statements, the burden of proof, who has the burden in each instance? What is your take on that? Admittedly, in our brief, we do identify the same standard as would occur in a motion to suppress, that there's the manifest weight for the factual conclusions by the court, and then there is the de novo for the ultimate question. But I'm asking, was Ornelas about a statement, or was it about an identification? I believe you are correct that it was about a statement. Some of the cases you cite, there's another case you cite that has to do with suppressing identification, which is totally different than suppressing a statement. So as you stand there, do you agree, or do you just not have an answer? I don't have an answer directly. I haven't thought about it that carefully. I should have. I apologize for that. No, that's all right. But I do think that the bifurcated standard would apply as well here, though, in the sense that the factual findings by the trial court at the hearing on the motion would be binding upon this court in the absence of showing that they're against manifest weight. And those factual findings were very important because one of the things the judge made at the hearing was that the ability to get the requisite number of fillers under the Chicago Police Department directive for the lineup was impossible, that the detectives were doing the best they could. They had to find young Hispanic males of a certain weight and a certain height within the confines of the Chicago Police Department at the time. And so he arranged for two of them to be brought to the area central where the defendant was being held. And in order to find even just a third filler, he had to have a police officer put on civilian clothes. So there was no suggestion that the procedures that were in place at that time, the Chicago Police Department has extensive regulations for everything they do. But what is your response to the argument that the new procedures were not followed? As we stated in our briefing, as we said below, they weren't followed because they weren't applicable yet. And yes, it's true that the statute was going to become effective on January 1st. As you stated, the Chicago Police Department has procedures and protocols for everything. And at that time, I know this for a fact, they were still developing those procedures and protocols. Let me ask you something else. The defendant was in a photo array. Apparently there were five photos? Yes, there were. Five. And he was the fourth photo that was viewed? Yes. That's my right question. It's three across and then two. But in the lineup, there weren't five people, but he was the fourth person. He was the fourth all the way to the right. And the record shows that he chose that particular spot. He chose to be up against the wall. Okay. What is the suggestion that the person shouldn't be in the same position in a photo array and a lineup? You can't suggest that he shouldn't be in photo array. What is that about? I'm not sure. It's been a while since I've looked at the statute regarding lineups and identification procedures. If you have a suspect, you're going to have him in the photo array. What else is the purpose of it? So then the person that was identified in the photo array, if he is the actual perpetrator and you subsequently take him into custody for purposes of a lineup, he's going to also be in that lineup, isn't he? Yes. Okay. So I'm not sure I understand this. So my recollection, and I apologize because I haven't read the statute recently, but my recollection is that there is something in there about in order to ensure that there isn't a bias or impermissible suggestiveness, that the police should do their best to ensure that the person does not appear in the lineup in the same position that he appeared. Okay. We'll take steps. But that's not what happened here anyway because the photo array that was presented to the victim, as I said, it had five photos, but it was three across the top with two underneath it. The defendant was in the fourth photo, but he was on the left in the second row. Oh. Whereas in the live lineup, there were four people in the room. He was given his opportunity to choose where he was. He chose all the way to the right position. But doesn't the new statute also suggest this particular way to have the photos displayed? And I don't think it would be the way that occurred here. I believe there's different ways whether they should be presented sequentially or simultaneously, and depending on who's doing the presentation, it says as to how that should occur. But doesn't the statute say sequentially? I think it has a preference for sequentially, but I don't believe it requires it in every instance. What about counsel's argument regarding Section 107A2 that it was in effect at the time, but, you know, we should still consider it anyway? Your Honor, and I guess the key comes down to the standard for suppression of an identification. And what the standard is is not has every single step been taken. It's is the lineup identification, is the identification procedure unnecessarily suggestive. And what that is is a totality of the circumstances test. Have the police engaged in a manner of procedure which would create a suggestive procedure unnecessarily. So it's the same standard we use whether it's a show-up, a photo array, or a lineup. And the question that has to be asked by the courts is was it unnecessarily suggestive? So the – and that's the constitutional standard that's been imposed. The legislative adaption of Section 107A was an attempt to put further directions and directives to the police as to how to engage in these. But they don't say the absence of these procedures equates with an unnecessarily suggestive lineup. In fact, my recollection of the statute – and, again, I apologize, I haven't read it recently – but my recollection of the statute says that if the procedures aren't complied with, you don't automatically suppress the identification. Instead, there's a determination whether or not the identification itself has been tainted by the failure to meet with these factors. And what that is is essentially placing the burden on the state at that point to prove that the identification procedure was not unnecessarily suggestive. Well, isn't that similar to what it was before in the sense that once there's a motion to suppress an identification, if the defendant meets the burden and the state has the obligation to show by clear and convincing evidence that the identification was not unduly suggestive? Yes. We could prove both it was not unduly suggestive or we could prove that there is an independent basis for it to allow for the unit. And so the legislature did impose new requirements with directions to ensure that we have – that we don't have suggestive identifications, but they haven't said this is what amounts to an unconstitutional identification procedure. Well, when this hearing was had, the statute was not in place, was it? The statute was already in effect at the time of the hearing. The identification procedure occurred in September of 2014. The statute went into effect January 1, 2015. Okay. So at the time of the hearing, was there a request to consider these – Yes, and there was – The statute? The defense attorney brought up the statute. The response was, Judge, it didn't apply at the time. And the judge says, it didn't apply. I'm not going to hold them to a standard that wasn't applicable to them. And what the judge found was that the detectives did their very best to find appropriate fillers to allow for a proper identification procedure. And he said that they acted in good faith. They did appropriate – the individuals that they found were well within the concept of similar nature in the sense that they were all within three years of age other than the law enforcement officer, but they were all of generally similar height and weight. It was appropriate identification procedure under the circumstances it was necessary. And so, therefore, he found that Mr. Vargas' identification from the lineup and photo array were properly admissible. And then at trial, Mr. Vargas specifically identified the defendant at trial. And, yes, I understand that counsel is now arguing, no, no, no, he must have identified somebody else in the courtroom. But the record doesn't bear that out. What the record shows, my understanding of it, is when he was asked to make an identification, he says, somewhere out there, because he didn't know where to go. And that's immediately when – So he sort of asked a rhetorical question, somewhere out there? But he didn't know where he was supposed to look. It went somewhere in the courtroom. I thought he pointed somebody out. There's no point in the record that he ever points anybody out. He asks, where is he supposed to look? Oh, that's your interpretation. But that's also consistent with the fact that nobody ever said, wait a minute, Your Honor, he just identified somebody else. And, as you know, this was a very hard-fought trial with excellent attorneys on both sides. The judge was very, very cognizant about what was going on throughout the trial, including several times pointing out to people in the gallery, please stop talking. No one ever said, wait a minute, this witness just identified somebody in the gallery. And I have seen records in the past where that does occur, but didn't happen here. And if nobody said it, I find it hard to believe that now, today, we can reach that conclusion. So was there or wasn't there anything blocking his view? There was an indication blocking the view. There was apparently a large screen that was to show the video. In Judge Blount's courtroom, which has been on the news quite frequently lately, in the corner between the bench and where the defense table sits is where he would keep the large screen for showing videos or pictures. And so it gets brought into the well of the courtroom or pushed back as need be. And so it seemed to be that where the witness is sitting here and the defense table is over here, that the screen is seemingly in the way. But, again, so in the light most fable of prosecution, we have Vargas' clear testimony, identifying the defendant in the courtroom. Vargas' clear testimony, how he drove the defendant to the victim's home to facilitate the deal, it fell apart, the defendant was the one who pulled out the gun, shooting happens immediately. The jury heard all that. The jury heard all of the challenges by the defense as to why they shouldn't believe it, whether because there wasn't enough time, because it wasn't reliable, because he was focused on the weapon, because he didn't see the actual shooting, because he may have been involved in it, whatever, when he's the one who called Buffaro afterwards and said, you messed up. They heard all that, and they rejected it, and they found instead the defendant was guilty. And it's for that reason, because that evidence has to be given in the light most fable of prosecution, because the jury was able to assess the credibility. We would ask you to affirm the trial court's ruling. Two questions on sufficiency of evidence. Was Vargas ever, he was an active participant in this transaction, so was he ever charged with a crime? Not that I know of. Not that I know of, and I would be surprised if they would. The Chicago police were much more concerned about solving a murder, so they weren't going to necessarily bring charges against somebody for a, what would probably be at the time a Class IV cannabis case, and maybe even just an attempt, a Class VIII attempt cannabis case. I don't think, I was also wondering about obstruction of justice. What about felony murder? I don't think felony murder would apply here, because it's not a forcible felony. All right, and what about Mr. Guidas? Why didn't he testify? Mr. Guidas, well, so he was subsequently arrested in Kissimmee, Florida, and he was charged with the same offense, and he was ultimately convicted. So I don't know how we could have forced him to testify. I don't believe he had ever made any statements on his own. So unless the defense was hoping to, but he had his own Fifth Amendment rights, he wouldn't have been able to be called to testify. So for those reasons, we would ask this court to affirm. Before Mr. Branstrader comes back up, Justice Gordon is the third panel member on this case. And though he is not here today, I'm sorry I didn't mention this at the very beginning, he will be participating fully in the decision and will listen to the tapes, and obviously has already had the briefs for his review. So I apologize for not mentioning that right away. Thank you, Your Honor. Mr. Branstrader. Certainly. Let me talk just briefly about the protocol on the photo array. As I understand it, with the passage of time, when an individual is subjected to these photo arrays, they should be one at a time. They should not be in a group. Not run by the guy investigating the case either. Because then there's a fear that after this photo array, after the passage of time, that the individual, when he sees the lineup and the person's in the same number, that's what he remembers. Oh, it was number four before, so it's number four. That's one. Also, Mr. Vargas' description of the offender, everybody's talking about him looking at him, dark clothes, dark hair, young guy. That's it. Nothing unique. And meaning no disrespect to Mr. Spellberg, in the record, on cross-examination, Mr. Vargas was asked if he picked out somebody in the gallery, and he said yes. He did. All as a result of the fact that he had an unreliable identification. To close my comments, I think it was said in Lerman that the evolution of this identification testimony and why the court is so much more receptive to it today, not only the number of exonerations we've had to deal with over the years, but the fact is that when identification is the only evidence against an individual who is about to be deprived of his liberty, this kind of testimony, this kind of an opinion is appropriate and relevant. And that's why Lerma takes us to where it's at. 704 says the opinion can be given. 704 became law. It became a rule in 2011. That was 2010. Thank you. All right. Thank you both for your comments today. The case was well-argued, well-briefed, and it will be taken under advisement. The court stands adjourned. Thank you.